Raymond W. HEAVEN, Plaintiff-Respondent,

v.

Mary Ann HEAVEN, Defendant-Appellant.

No. 30992.

St. Louis Court of Appeals.

Missouri.

Dec. 18, 1962.

**34**

George E. Murray, Clayton, for appellant.

Henry G. Morris, St. Louis, for respondent.

SAMUEL E. SEMPLE, Special Commissioner.

This is an action for divorce instituted by the plaintiff husband wherein the defendant wife also sought a divorce upon a cross-bill. The trial court after hearing the evidence entered its decree finding against the husband on his petition and awarding a divorce to the defendant wife on her cross-bill. Plaintiff filed a Motion for New Trial and thereafter the trial court entered an order granting plaintiff a new trial from which defendant has duly taken an appeal to this court.

The two-day trial was vigorously contested. Only the gist of the testimony pertinent to the questions raised on this appeal will be set forth herein as no useful purpose will be served in setting out all of the evidence in detail.

The parties were married on January 7, 1948 and separated in August, 1960. They lived in Cedar Hill, Missouri, from the time of their marriage until 1953 and after several moves purchased a home in Meadow Acres, a subdivision in St. Louis County, where they lived together until the time of separation and thereafter have continued to live in the same place, but not as man and wife, up to the time of the trial. Plaintiff, a man 47 years old at time of trial, was and had been for some years employed as a salesman for a brewing company, whose duties required that he call on places where his employer's products were sold. Defendant was employed at several places during most of the period of the marriage and had worked for the Chrysler Corporation for some two years prior to the time of trial. One child, Timothy, eleven years old in 1961, was born of the marriage.

Plaintiff, in support of his petition for divorce, testified that defendant called him one vile name "innumerable times" and other vile names "always" and frequently cursed and called him vile names in front of their son. He also testified that defendant clawed him with her fingernails "at any time." That after the separation in August, 1960, defendant came at him with her fingernails to cut him up; that she spat on him, threw a glass of water on him, and when she came at him with her fingernails he got against the kitchen cabinet and kept her away with his feet. None of the foregoing evidence was corroborated. Plaintiff also

testified that defendant cut him with scissors in the abdomen during the summer of 1960. On cross-examination plaintiff testified that an argument started in a discussion about insurance and that defendant who was manicuring her nails at the time "swung with the scissors and her nails * * *." "I grabbed her by the hair and held her like that, away from me, sir, and I got cut." Plaintiff produced a witness in rebuttal who testified that he was a neighbor of the parties. On one occasion Tim, the son of plaintiff and defendant, came over to get him to come to their home. When he got to the door, plaintiff and defendant were arguing but stopped when he entered. Plaintiff's T shirt was torn and had blood on the front of it and that defendant " * * * was pretty well messed up herself * * *", and she had a pair of cuticle scissors in her hand.

Plaintiff further testified that defendant would go out at night three or four times a week, every week, and would stay out until late hours and sometimes when plaintiff would ask her where she had been defendant would tell him it was none of his business. Plaintiff testified that he had not seen his wife out with another man but that he told her one evening, "I think you have been in every motel in St. Louis County", and her answer was "I have, so what."

Defendant in her testimony denied that she ever called plaintiff by the vile name he stated she used innumerable times, and denied that she ever used such language. She further denied clawing plaintiff with her fingernails or that she had ever cut or clawed him; that she did not cut him with scissors and did not throw water at him. Defendant testified that she never went out in the evening without telling plaintiff where she was going and getting his permission to do so. She also stated that when her husband accused her of being in every motel in town or county that she ignored the accusation and made no answer to him.

Defendant in support of her cross-bill for divorce, testified that plaintiff started to drink excessively approximately thirteen years ago and came home intoxicated two or three times a week. She detailed an incident of plaintiff being drunk and lying in the front yard in public view of the neighbors and their children in August, 1959. Defendant further testified that plaintiff embarrassed and humiliated her by his intoxicated condition at a church Strawberry Festival in May of 1960. She also related specific incidents of plaintiff becoming intoxicated at a Christmas party in 1958, a party at the Coronado Hotel in 1957, a ravioli dinner on Palm Sunday in 1958, a Christmas party of the city sales department of his employer in December, 1956. Defendant had accompanied her husband to these social affairs, and to her embarrassment he became so intoxicated that he had to be helped home.

Defendant further testified that plaintiff struck her and subjected her to physical violence and that in the summer of 1954 plaintiff came home at 4 a. m. and struck her on the face and body leaving her bruised and unable to work for several days. Defendant related another incident in April of 1958 plaintiff came home about 2:00 or 2:30 a. m. and started yelling and beating defendant and pulled out some of her hair by the roots. That as a result of the beating she received she had to have three teeth extracted. Defendant also testified that on July 8, 1960, plaintiff demanded that she sign some insurance papers which defendant refused to do and plaintiff got up and started beating her. Plaintiff's version of this incident as previously set out was that defendant cut him with scissors but defendant denied so doing. This altercation was broken up by their neighbor, Mr. Leveque, coming to the door. Defendant also testified that after the separation on September 8, 1960, she and her son returned home about 11 p. m. after visiting plaintiff's sister and found plaintiff seated in the breezeway. Plaintiff had been drinking. Plaintiff threatened defendant about pulling down the garage door and thereafter came at her kicking, beating and pulling her hair and

threatened to kill her. Defendant states she suffered bruises and a cut lip as a result of this incident.

Defendant stated that plaintiff had been gone from home for periods of as long as a day and a half without explanation and that his clothing would smell of perfume and defendant had seen lipstick on the collar of his shirt when he arrived home.

Defendant further testified that plaintiff called her vile and obscene names over a period of years and that plaintiff humiliated and embarrassed her by accusing her in front of others of associating with other men and committing adultery with them. Defendant denied that she associated with other men in any way and on cross-examination specifically denied going to a motel with a man on the night of July 26, 1960, or at any other time. Defendant further testified on cross-examination that on the night of July 26, 1960, she had her hair fixed at the Clairol Center on Delmar and left there about 9:30 p. m. and proceeded to Hampton and Gravois and picked up a Mrs. Dover, a friend, and took her to her home in Cedar Hill.

Plaintiff's sister, a Mrs. Kerwin, testified on behalf of defendant that she had been a frequent visitor in the home of plaintiff and defendant. That she had observed defendant was a good mother and kept a very clean home. She further stated that the conduct of her brother, the plaintiff, toward his son was that " * * * at times he would be very kind; when he would have a level head * * *", "when he was sober." She further testified she observed him on occasions when he wasn't sober. Mrs. Kerwin also testified that plaintiff on more than one occasion when they were together accused defendant of running around with other men.

Walter Kerwin, plaintiff's brother-in-law, testified that he saw plaintiff at the church Strawberry Festival in May of 1960 when plaintiff stumbled quite a bit, talked incoherently and smelled of alcohol.

Plaintiff in rebuttal called John Wilkerson, a private detective hired by plaintiff, and Viola Wilkerson, his wife, who testified in substance that on the night of July 26, 1960, at request of plaintiff, they parked their car near the Clairol Center on Delmar; that they observed a woman answering a description of defendant (furnished by plaintiff) come out of the Clairol Center shortly after 10 p. m. and get in a Dodge automobile bearing a license number issued to defendant. The woman was observed sitting in the Dodge for a few minutes when a Ford station wagon driven by a man pulled up beside the Dodge. A few moments later the Dodge drove off followed by the station wagon and both vehicles were followed by the witnesses and were seen entering a motel. A few moments later the Dodge car and the Ford station wagon were observed in the parking lot of the motel parked near the motel units and the man and woman were observed leaving their cars but the witnesses did not see either the man or woman enter any motel room or unit. About an hour and fifteen minutes later the Dodge car driven by a woman was observed driving away from the motel. Defendant thereafter offered Gertrude Dover as an alibi witness, who testified that on the 26th of July, 1960, she was shopping in St. Louis and in the afternoon called defendant who was a friend and former neighbor and asked if defendant would pick her up that evening and drive her home. That between 9:30 and 10 p. m. defendant picked her up at Hampton and Gravois and drove her to her home in Dittmer, Missouri some 28 miles away. That they arrived at her home about 10:30 p. m. Defendant stayed about 45 minutes at her home before leaving.

Plaintiff testified further in rebuttal and denied that he drank excessively or that he had ever been drunk. He stated that in 1957 he had virus encephalitis which resulted in his sense of balance being impaired and caused him to stumble. He also testified that he did drink as it was required in his work, but that he did not drink to excess. Plaintiff also denied that he had ever struck

his wife but stated that he had held her away from him when she came at him.

A great deal of evidence was offered as to the financial condition of the parties which will be omitted as not being necessary in determining the questions raised by this appeal.

The foregoing constitutes all of the evidence of any consequence on which the trial court entered its decree on February 9, 1961, finding against plaintiff and denied him the relief requested in his petition. The decree further found for defendant on her cross-bill, granting her a divorce awarding her custody of the minor child subject to reasonable visitation by plaintiff and right of plaintiff to temporary custody every other weekend and for two weeks during the summer vacation. The decree also granted defendant specified amounts for alimony, child support and attorney fees. Thereafter on February 20, 1961, the plaintiff filed a Motion for New Trial setting out thirteen specifications of error.

On May 17, 1961, plaintiff filed a motion to cite defendant for contempt of court on the ground that defendant denied to plaintiff temporary custody of the child at the times specified in the decree of divorce. There is nothing in the record to show this motion was ever ruled on by the court. However, on the following day, May 18, 1961, the court granted plaintiff a new trial by a signed order which read as follows:

"The Court after due and careful consideration of plaintiff's motion for new trial heretofore argued and submitted, and by a further review of all the evidence and proof adduced in the trial of said cause does grant plaintiff a new trial and further holds the former order granting defendant relief is void and of no effect."

Thereafter on May 23, 1961, defendant duly filed her Notice of Appeal to this court.

On July 19, 1961 after withdrawal of plaintiff's trial counsel and the entry of appearance of new counsel for plaintiff, the court made an order, by consent of the parties, making temporary allowances to defendant for alimony, suit money, child support and attorney fees pending the appeal. Thereafter on August 11, 1961, the court entered of record the following signed order:

"The Court on its own motion makes the following order nunc pro tunc as to the order of 18 May 1961 wherein plaintiff's motion for a new trial was sustained, inserting after the words 'new trial' in line 7 the following, to-wit:

"'on the grounds set forth in plaintiff's motion for a new trial, numbered 1, 2, 6 and 12, and further finds that defendant did not sustain the burden of proof to support a decree of divorce in her favor.'"

This order was apparently made by the court of its own motion and without notice to the parties as there is nothing in the record to indicate any application or request for the order or any prior notice given that the court contemplated such action.

■ The first question to be considered is whether the so called "Order nunc pro tunc" of August 11, 1961 was a valid order. A determination of this question is of importance in ascertaining the approach to be taken by the court in considering the other questions raised in this appeal.

Defendant contends that the order nunc tunc of August 11, 1961 was an attempt to substitute a new annd different order than the order of May 18, 1961 from which this appeal was taken and was not based on any previous written entry or record in the case. The rule governing the authority of a court to correct its records by a nunc pro tunc order was stated in Aronberg v. Aronberg, Mo.App., 316 S.W.2d 675, 681, as follows:

"The important principle to remember in detemining the court's authori-

ty to correct its records is that it can only correct the record so as to reflect the action actually taken by the court at the time it entered its order or judgment. A nunc pro tunc entry can only be employed to correct a clerical mistake or misprision of the clerk. Such an entry cannot be invoked to correct a mistake or oversight of the judge, nor be used to correct judicial errors, nor to render a judgment different from that actually rendered, even though the judgment actually rendered was not the judgment the judge intended to render. Wiggins v. Perry, 343 Mo. 40, 119 S.W. 2d 839, 126 A.L.R. 949; Campbell v. Spotts, 331 Mo. 974, 55 S.W.2d 986; Clancy v. Herman C. G. Luyties Realty Co., 321 Mo. 282, 10 S.W.2d 914; Burnside v. Wand, 170 Mo. 531, 71 S.W. 337, 62 L.R.A. 427; Arkansas-Missouri Power Company v. Hamlin, Mo.App., 288 S.W.2d 14; Schenberg v. Schenberg, [Mo.App.] 307 S.W.2d 697."

It has also been held that to authorize a correction by nunc pro tunc order there must be some record either in the minutes of the judge, the clerk's entries or in some other paper in the case authorizing such correction, Wegman v. Fendelman, Mo. App., 333 S.W.2d 290, 297; Doerschuk v. Locke, 330 Mo. 819, 51 S.W.2d 62.

In the instant case, the order of May 18th granted plaintiff a new trial and nothing more. The court did not specify of record the ground or grounds on which the new trial was granted as required by Supreme Court Rule 78.01, V.A.M.S. The "order nunc pro tunc" made by the court on August 11th obviously was made to supply the ground or grounds omitted from the order of May 18th, but there is nothing from the record in this case such as minutes made by the court, clerk's entries or other writings to indicate what ground or grounds, if any, were the basis for the order granting a new trial. It is therefore concluded that the trial court had no authority to make the "order nunc pro tunc"

of August 11, 1961, and that this appeal is taken from the original order granting a new trial of May 18th, which did not specify any ground or grounds on which the new trial was granted.

■ Supreme Court Rule 83.06(b) supplements Supreme Court Rule 78.01 by declaring that when a trial court grants a new trial without specifying of record the ground or grounds on which the new trial is granted, the presumption shall be that the trial court erroneously granted the motion for new trial and the burden of supporting such action is placed on the respondent. Subparagraph (c) of Rule 83.06 also provides that if the trial court grants a new trial without specifying discretionary grounds, it shall never be presumed that the new trial was granted on discretionary grounds.

In applying these rules to the instant case it is apparent that as no grounds were specified of record in granting plaintiff a new trial the presumption shall be that the motion for new trial was erroneously granted and the burden here is upon plaintiff to justify the action of the trial court.

Plaintiff makes only two contentions in support of the order granting a new trial, (1) that the trial court has discretion to grant at least one new trial which is conclusive unless abused and (2) the court being the trier of the facts and having determined the issues of fact presented, can subsequently in its discretion grant a new trial, if upon reconsideration it finds from the evidence that the defendant was guilty of such misconduct as to preclude her from being an innocent and injured party entitled to a divorce.

■ It is true that trial courts have wide discretion in passing on motions for new trial where there is error in the record, but the power of a trial court to grant a new trial is discretionary only as to questions of fact. Schipper v. Brashear Truck Co., Mo., 132 S.W.2d 993, 995, 125 A.L.R. 674; Cooper v. 804 Grand Bldg. Corp. Mo., 257

S.W.2d 649, 655; McCormack v. St. Louis Public Service Co., Mo., 337 S.W.2d 918, 921. The trial court in the instant case had the power to grant a new trial on discretionary grounds, limited to questions of fact and matters affecting the determination of issues of fact, but in exercising such discretionary power the court was required to observe the prescribed method required by Rule 78.01 of specifying of record the ground or grounds on which the order granting a new trial was based. It would thus logically follow that the plaintiff has not carried the burden of supporting the order granting a new trial; that this action of the trial court was erroneous under Rule 83.-06(b); and that the order granting a new trial should be set aside. However, this is an action for divorce with which the state is concerned and in which the conscience of the court must protect the public interest, Willis v. Willis, Mo.App., 274 S.W.2d 621, 626. A case of this kind is tried de novo and it is the duty and responsibility of this court to review the evidence and if possible reach its own conclusions therefrom. Oliver v. Oliver, Mo.App., 325 S.W. 2d 33, 38; Clemens v. Clemens, Mo., 235 S.W.2d 342.

In this case both plaintiff in his petition and defendant in her cross-bill sought to obtain a divorce on so-called general indignities. Every divorce case based on indignities must be determined on its own facts, Clark v. Clark, Mo.App., 306 S. W.2d 641, 646. Indignities sufficient to justify the granting of a divorce ordinarily must amount to a continuous course of conduct as distinguished from a single act or occasional acts. In addition, the acts relied upon must amount to a species of mental cruelty, and should demonstrate a course of behavior by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relationship. Clark v. Clark, supra; Coleman v. Coleman, Mo.App., 318 S.W.2d 378, 381. It should also be observed that a party to be entitled to a divorce should be an innocent and injured party but the courts of this state have repeatedly held that a party to a divorce action is not deprived of his status as an innocent party simply because his conduct has not been perfect at all times. To prevent a person from being adjudged an innocent and injured party, his or her behavior and conduct must have been such, as to entitle the other spouse to a divorce, Elgin v. Elgin, Mo.App., 301 S.W.2d 869, 872.

Plaintiff's testimony in support of the indignities that he has charged defendant particularly with use of bad language and calling him vile names, staying out late at night, clawing plaintiff with her fingernails, spitting and throwing water on plaintiff is very general and not corroborated to any extent by other evidence. Plaintiff's evidence as to acts of physical violence by defendant such as the scissors incident when considered in context with all the other evidence does not clearly show an unprovoked attack by defendant on plaintiff but rather a dispute in which both parties were actively engaged. Plaintiff's evidence does not clearly demonstrate with convincing probative force that he has suffered intolerable indignities at the hands of defendant sufficient to entitle him to a divorce.

On the other hand, even though defendant is not without fault, the incidents and episodes related by her, some of which are corroborated by circumstances and other witnesses, show that for a number of years she has been subjected to a course of conduct and behavior on part of the plaintiff of such an intolerable nature as to be subversive of the family relationship. It appears from an independent review of the entire record that the trial court reached the right result in its decree denying plaintiff relief and granting defendant a divorce.

For the reasons stated, it is recommended that the order granting a new trial be reversed and that the cause be remanded with directions to reinstate the original decree

of divorce entered by the trial court.

PER CURIAM.

The foregoing opinion of SEMPLE, Sp. C., is adopted as the opinion of this court. The order granting a new trial is reversed and the cause remanded with directions to reinstate the original decree of divorce.

ANDERSON, P. J., WOLFE, J., and JAMES D CLEMENS, Special Judge, concur.